✓ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

2:29 pm, May 25 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Susan Ambridge Paris, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Baltimore Division, Baltimore, Maryland, being duly sworn, depose and state as follows:

1.      I am a Special Agent with the FBI and have been since June 2016.  I am currently assigned to the Maryland Child Exploitation and Human Trafficking Task Force in the Baltimore Division of the FBI and have been assigned investigations concerning sexual exploitation of children and child pornography.  During my employment with the FBI, I have gained experience through training in seminars, classes, and daily work related to conducting these types of investigations.  In addition, I have also received training regarding the use of the Internet and digital communications as they pertain to federal investigations.  I have participated in the execution of numerous search warrants, some of which have involved child exploitation offenses. Many of the search warrants resulted in the seizure of computers, cell phones and/or "smart phones," magnetic storage media for computers, other electronic media, and other items evidencing violations of federal laws.  I have also participated in the execution of numerous search warrants for online accounts, such as email accounts, online storage accounts, and other online communication accounts related to child exploitation and/or child pornography.  In the course of my employment, I have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media and within online accounts.  I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Titles 18 and 21 of the United States Code.

2.     As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.     This affidavit is made in support of an application for warrants to search the following (hereinafter referred to as the "TARGET ACCOUNTS"):

    a.     The Google accounts associated with the following:

        1.     demonspawn19921992@gmail.com (112203910868063516633);
        2.     nanooknightclaw@gmail.com (106823853642418833548);
        3.     raidenrudolph468@gmail.com (109123574116671180712);
        4.     simbaslave92@gmail.com (100853049653973935165);
        5.     simfang1992@gmail.com (116040751515256170839);
        6.     sadiekoontz19921992@gmail.com (104813393045891901365);

    b.     The Facebook accounts associated with the following:

        1.     100080355681050;
        2.     100085256612758; and
        3.     100088721310697;

    c.     The Instagram account associated with the following:

        1.     Demonspawn19921992@gmail.com;

    d.     The Kik account associated with the following:

        1.     Sadiekoontz;

    e.     The Reddit account associated with the following:

        1.     Sadiekoontz19921992@gmail.com;

    f.     The Snapchat accounts associated with the following:
        1.     Demonspawn19921992@gmail.com;
        2.     nanooknightclaw@gmail.com;

4.     The TARGET ACCOUNTS are to be searched for evidence of violations of Title 18, United States Code, Section 2251(a) (sexual exploitation of children); and Title 18, United

States Code, Section 2252A(a)(5)(B) (possession of child pornography) (collectively the "TARGET OFFENSES").

5.      The statements in this affidavit come from my personal observations, my training and experience, and information obtained from other FBI agents, police officers, witnesses, cooperating sources, records, and reports.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES are located in the TARGET ACCOUNTS.

**SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY**

6.      Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the internet to view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

        a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

        b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to

lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly.

e. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

f. Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

7. Based on my investigative experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

a.     Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  It has also revolutionized the way in which child pornography collectors interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies.)  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  As a result, there were definable costs involved with the production of pornographic images.  To distribute these on any scale also required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls.  Any reimbursement would follow these same paths.

b.     The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children.  Computers, smartphones and the internet serve four functions in connection with child pornography.  These are production, communication, distribution, and storage.

c.     Mobile devices such as laptop computers, smartphones, iPods, iPads and digital media storage devices are known to be used and stored in vehicles, on persons or other areas outside of the residence.

d.     Smartphones have the capability to access the Internet and store information, such as videos and images.  As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop.  An individual using a smartphone can also easily plug the device into a computer, via a USB cable, and transfer data files from one digital device to another.  Many people generally carry their smartphone on their person.

e.     Child pornographers can now transfer photographs from a camera onto a computer-readable format.  With the advent of digital cameras, the images can now be transferred directly onto a computer.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

f.     Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem.   Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

g.     The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.  Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals

such as AOL Inc., Yahoo, and Google, Inc., Facebook, Dropbox, Instagram, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images, videos, and other files. The data is maintained on the servers of the providers, and is occasionally retained by the providers after the user deletes the data from their account.

h.     In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i.     Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the distribution, receipt and possession of child pornography will be found in the TARGET LOCATIONS notwithstanding the passage of time.

j.     In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

k.     When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

l.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

m.     The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing over 500 GB of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

n.     Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

## GOOGLE

8.     Google provides numerous free services to the users with a Google profile. Some of services include, Gmail, Google Hangouts, Google Wallet, Google+, Google Drive, Google Photos and Albums, and YouTube.  Gmail is a web-based email service that can also be accessed via mobile apps. A Google account comes with 15GB of free storage. This is shared between Gmail, Google Drive, and Google photos. Users can receive emails up to 50 megabytes in size, including attachments, while they can send emails up to 25 megabytes.  In order to send larger files, users can insert files from Google Drive into the message.  Emails remain in an active Gmail account until deleted by the user.  Google Hangouts is a communication platform which includes instant messaging, video chat, and SMS and Voice Over IP (VOIP) features service that provides both text and voice communication.  Google Hangouts allows conversations between two or more users.  Chat histories are saved online, allowing them to be synced between devices. Google Wallet is a mobile payment system that allows its users to store debit cards, credit cards, loyalty cards and gift cards, among other things, on their mobile phones.  Google+ is a social networking service.  (In 2019, Google shut down Google+ (personal). Users were able to download and save their data prior to the shutdown.) Google Drive is a file storage and synchronization service, which provides users with cloud storage, file sharing, and collaborative editing.  Google Photos is an image hosting and sharing web service that allows users with a Google account to store and share images for free.  YouTube is a free video sharing website that allows users upload, view and share videos.

# FACEBOOK[1]

9.      Meta Platforms Inc. owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.      Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

11.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12.      Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

13.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

14.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

15.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

16.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

17.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

## INSTAGRAM

18.     Meta Platforms Inc. owns and operates Instagram. Instagram is an online mobile photo-sharing, video-sharing and social networking service that is available for free. Users create accounts, which allows users to share photos, videos and messages, and control who is able to view their photos, videos and comments

## KIK

19.     Kik, owned by MediaLab.ai, is a free instant messaging mobile application. Account registration requires a first and last name, e-mail address, and birth date. Users can join groups and exchange messages, videos, and pictures. Users are also able to chat privately, exchange videos and pictures, and conduct real time video calls.

## REDDIT

20.     Reddit is a community driven platform where registered users can submit content to include text, images, and videos. These posts can be voted on by other users to determine which is displayed on the platform and users can comment on other user's posts. In order to obtain an account, a user must supply their Google account, Apple ID or e-mail address. In some regions, users may be able to supply their phone number to obtain an account. Reddit also supports a mobile application. Reddit Premium is a paid subscription which removes ads, provides Reddit coins (a virtual good used to buy Reddit awards), access to exclusive avatar gear, custom app icons, and access to r/lounge.

21.     Within Reddit, there are four types of communities. Public communities are available to anyone with a Reddit account. All users can view, comment, and post. Restricted communities make viewing and commenting available to all users. However, only moderator approved users can post. Private communities are available only to approved members of that community (for viewing and participation). Premium-only communities are available to Reddit Premium members.

## SNAPCHAT

22.     Snapchat is owned by Snap, Inc.  Snapchat is a messaging application for mobile devices.  The application provides a way to share moments with photos, videos and text.  Some of the features of Snapchat are Snaps, Stories, Memories and Chat.  Snaps are when a user takes a photo or video using their mobile device in real-time and selects which of their friends to send the message to.  Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after the message is opened in the case of the recipient.)  Users are able to save a photo or video they've taken locally to their device or to Memories, which is Snapchat's cloud-storage service.

23.     A user can add photo or video Snaps to their "Story."  Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchat users or just the user's friends for up to 24 hours.  Stories can also be saved in Memories.

24.     Memories is Snapchat's cloud-storage service.  Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories.  A user can also edit and send Snaps and create Stories from these Memories.  Snaps, Stories, and other photos and videos saved in Memories are backed up by us and may remain in Memories until deleted by the user.

25. A user can also type messages, send photos, videos, audio notes, and video notes to friends within Snapchat application using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties and both parties swipe away from the Chat screen, the message will be cleared. Within the Snapchat application itself, a user can opt to save part of the Chat by tapping on the message that the user wants to keep. The user can clear the message by tapping it again.

## JURISDICTION

26. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

A. Initial Complaint

26. On or about March 03, 2023, Complainant 1 reported to the Hagerstown Police Department (hereafter HPD) that her babysitter, who also resided with her, **Harrison James Miller (hereafter Miller)**, had taken naked pictures of her four-year-old son (hereafter Minor Victim 1). When Complainant 1 was changing Minor Victim 1's diaper, he put his legs above his head and spread his buttocks. When asked if he did that for anyone else, Minor Victim 1 said he did not. However, Minor Victim 1 then stated that **Miller** took naked photos of him when he babysat. During an interview by the Washington County Department of Social Services, Minor Victim 1 stated Miller took photos of him using his "skeleton" phone.

27. On or about March 05, 2023, Complainant 1 notified HPD that Minor Victim 1 also told her **Miller** licked his anus and penis.

28. In addition to babysitting Minor Victim 1, **Miller** also babysat the neighbor's children. The neighbor, Complainant 2, talked to Minor Victim 2 (an eight-year-old female) and her sister, Minor Victim 3 (a five-year-old female) regarding **Miller**. Minor Victim 2 stated **Miller** asked to see "down below," while pointing to her private area, the last time he babysat but that he did not touch her. Minor Victim 2 said **Miller** did it because that is how you show love. Minor Victim 3 would not answer if **Miller** took pictures of her but said that he did not take any pictures of her without her clothes on. When asked if **Miller** ever asked to take picture of Minor Victim 3, Minor Victim 3 nodded her head yes.

29. On or about March 14, 2023, **Miller** was contacted by HPD and voluntarily came to the HPD for an interview. **Miller** was advised he was free to leave, was not under arrest, and could stop the interview at any time. **Miller** advised the detective he had smoked marijuana prior to being contacted by HPD and further advised he knew what they were talking about, and his marijuana use did not affect his ability to comprehend the situation. During the interview, **Miller** made the following statements:

    a. The only pictures **Miller** took of Minor Victim 1 were selfies. When asked specifically if **Miller** had taken any naked pictures of Minor Victim 1, Miller stated he could not remember.

    b. If **Miller** had taken naked pictures of Minor Victim 1, they would not have been sexual in nature, and he would have used his cellular phone to take those pictures. **Miller** had the same cellular phone since he was 30 years old and did not have another cellular phone.

    c. Later in the interview, when asked if **Miller** had taken naked pictures of Minor Victim 1, **Miller** stated he did. **Miller** then stated he did not want to

talk about it further and that he tried to delete the pictures off his cell phone because he felt bad about what he did. Miller advised that HPD could have his phone, a black Samsung cell phone in a black case, and provided the password.

    d.    **Miller** would give Minor Victim 1 a bath while Complainant 1 was at work. On one occasion, Minor Victim 1 was in the bath and something fell into the water. **Miller** did not know what it was so picked it up. While picking up the item, Minor Victim 1's penis was by **Miller's** face. **Miller** took a chance and kissed Minor Victim 1's penis a couple of times.

    e.    On two occasions, **Miller** kissed Minor Victim 1's anus.

30.    **Miller** asked to stop the interview and was allowed to leave. On or about March 15, 2023, an arrest warrant for **Miller** was obtained and served by HPD.

31.    On or about March 16, 2023, Susan Belle Walker (hereafter Walker) contacted HPD. **Miller** resided at Walker's residence for several weeks prior to his arrest. Walker advised that her adult son, William Walker (hereafter William), found a cellular phone in a bedroom of their residence that **Miller** shared with another individual. Upon finding the phone, William looked through it and saw a photo of a child's buttocks area. William knew the cellular phone passcode to be "1992" because he had used it in the past. The cellular phone was a gray Samsung cellular phone in a black case with skulls on it, consistent with the cell phone described by Minor Victim 1 and was turned over to HPD on or about March 16, 2023.

B.    <u>Harrison Miller's sex offender history</u>

32.    In June 2016, Jerrod Jones, Minor Victim 4's babysitter, was walking by a bedroom in Minor Victim 4's residence and saw **Miller** "dry humping" Minor Victim 4. (In June 2016,

Minor Victim 4 was an eight-year-old female.) **Miller** had an erection. **Miller** was subsequently arrested and charged with three counts of indecent assault by the Pennsylvania State Police (hereafter PSP). In August, 2016, **Miller** pleaded guilty to one count of indecent assault and was sentenced to nine months to 60 months incarceration.

C.  Search of gray Samsung phone in skeleton case

33.  On or about March 21, 2023, HPD obtained a search warrant for the gray Samsung cellular phone with the skeleton case. Due to technical capabilities, the search warrant was not successfully executed and no evidence was collected from the phone.

34.  On or about March 29, 2023, HPD contacted the FBI to request assistance. The FBI received the gray Samsung phone in the skeleton case from HPD on March 29, 2023 and obtained a federal search warrant  (23-1178-ADC) for the device on or about April 06, 2023.

35.  A preliminary search of the gray Samsung phone in the skeleton case was conducted, and the following was found:

a.  The model number for the phone was SM-J737P and had a profile name of Nanook NightClaw. The telephone number was 240-313-0484. The account cloud storage was using approximately 4.2 GB of 15 GB.

b.  The following accounts were associated with the device:

i.  demonspawn19921992@gmail.com (112203910868063516633);

ii.  nanooknightclaw@gmail.com (106823853642418833548);

iii.  raidenrudolph468@gmail.com (109123574116671180712);

iv.  simbaslave92@gmail.com (100853049653973935165);

v.  simfang1992@gmail.com (116040751515256170839);

vi.  sadiekoontz19921992@gmail.com (104813393045891901365);

vii.      Facebook account 100080355681050;

viii.      Facebook account 100085256612758;

ix.      Facebook account 100088721310697

x.      Instagram account associated with

demonspawn19921992@gmail.com;

xi.      Reddit account associated with

Sadiekoontz19921992@gmail.com;

xii.      Snapchat account associated with e-mail address

demonspawn19921992@gmail.com; and

xiii.      Snapchat account associated with e-mail address

nanooknightclaw@gmail.com

c.      One image found on the device was a screenshot of a Kik account profile. This was for an account belonging to user Sadiekoontz.

d.      There was a photo gallery application which contained a password protected folder. The password for the folder was found to be "1992." Contained in that folder were approximately 23 images of potential child pornography. Metadata for the images show they were taken on approximately five different dates from November 2022 through February 2023. They appear to be of the same prepubescent male. One image is described as follows: a prepubescent male is laying on a blue sheet/comforter. He is naked from the waist down, exposing his genitals. He is wearing a red shirt with blue sleeves that is pulled up towards his head exposing his stomach, and his face is clearly visible. These images were taken with a Samsung SM-J737P; the same make and model of the phone that was searched. On April 24,

2023, the FBI interviewed Complainant 1, who identified Minor Victim 1 as the prepubescent male in the 23 images found on the gray Samsung.

    e.    Multiple images of potential child pornography appeared to be of a prepubescent female. In one image, the prepubescent female is naked and laying face up on a beige sheet. An adult penis is attempting to penetrate the prepubescent female's vagina. On April 24, 2023, the FBI interviewed Complainant 2, who identified Minor Victim 3 as the prepubescent female in the multiple images found on the gray Samsung.

    f.    There were multiple saved notes on the device. Two of the titles were "My secret lover [Minor Victim 1]" and "My secret lover [Minor Victim 2]." These were last edited on March 13, 2023 and February 23, 2023 respectively.

    g.    There were multiple images and videos depicting computer generated/animated adults engaging in sex acts with infant and prepubescent males and females.

D.    <u>Victim interviews</u>

36.    On May 05, 2023, the FBI conducted forensic interviews of Minor Victim 1 and Minor Victim 3. During the interviews all the victims were shown images found on the Gray Samsung, model number SM-J737P. Minor Victim 1 identified himself in the image previously described in paragraph 35d. Minor Victim 3 identified herself in the image previously described in paragraph 35e. Minor Victim 3 also stated that that this (the pictures) happened a lot of times.

E.    <u>Target Accounts</u>

37.    Google provided the following information in response to an administrative subpoena for the following accounts:

        Account: 112203910868063516633;
        Email: demonspawn19921992@gmail.com
        Name: James Miller
        Created on: 04/22/2022

Recovery SMS: 240-329-7063
Google Pay billing: James Miller; 600 Brighton Pl, Hagerstown, MD 21740[2]

Account: 106823853642418833548
Email: nanooknightclaw@gmail.com
Name: Nanook Nightclaw
Created on: 04/25/2022
Birthday: 07/21/1992[3]

Account: 109123574116671180712
Email: Raidenrudolph468@gmail.com
Name: Raiden Rudolph
Created on: 11/27/2022

Account: 100853049653973935165
E-mail: simbaslave92@gmail.com
Name: Simba Slave
Created on: 06/25/2022
Recovery SMS: 240-849-8498
Birthday: 07/21/1992

Account: 116040751515256170839
Email: simfang1992@gmail.com
Name: Simba Firefang
Created on: 06/13/2022
Recovery e-mail: demonspawn19921992@gmail.com
Recovery SMS: 240-849-8498
Birthday: 07/21/1992

Account: 104813393045891901365
Email: sadiekoontz@gmail.com
Name: Sadie Koontz
Created on: 07/20/2022
Recovery e-mail: demonspawn19921992@gmail.com

38.     Facebook provided the following information in response to an administrative

subpoena for the following accounts:

User: 100080355681050
Name: Harrison Miller
Registered email address: nanooknightclaw@gmail.com and
demonspawn19921992@gmail.com

---

[2] According to law enforcement databases, this is the address of Miller's mother
[3] According to law enforcement databases, this is Miller's date of birth.

Registration date: 2022-04-22 14:32:27 UTC
Account still active: True

User: 100085256612758
Name: Sadie Koontz
Registered email address: sadiekoontz19921992@gmail.com
Registration date: 2022-08-27 18:24:39 UTC
Account still active: True

User: 100088721310697
Name: Sean Yeats
Registered email: simfang1992@gmail.com
Registration date: 2022-12-06 18:10:56 UTC
Account still active: True

39.     Instagram provided the following information in response to an administrative

subpoena for the following account:

Account identifier: demonspawn19921992
Name: Harrison Miller
Registered email: demonspawn19921992@gmail.com
Registration date: 2022-05-25 23:31:26 UTC
Account still active: True

40.     A search of Kik on April 21, 2023 for the account sadiekoontz showed this

account was still active and had been active for 124 days. Kik provided the following

information in response to an administrative subpoena for the following account:

Username: sadiekoontz
First name: Sadie
Last name: Koontz
Email: sadiekoontz19921992@gmail.com
Registration timestamp: 12/18/2022

41.     Reddit provided the following information in response to an administrative

subpoena for the following account:

Account name: sissySadieKoontz92
Registration date: 2022-07-30 20:39:21 UTC
Email address: sadiekoontz19921992@gmail.com
Email verified: True

42.     An administrative subpoena was sent to Snapchat for the accounts associated with demonspawn19921992@gmail.com and nanooknightclaw@gmail.com. As of May 08, 2023, they have not responded to the subpoena.

**SUMMARY**

43.     Based upon the above, I believe that there is probable cause to believe that contraband, evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are located within the TARGET ACCOUNTS.

44.     I also believe that **Miller** displays characteristics common to individuals who have a sexual interest in children, and who access with the intent to entice and coerce, view and/or, possess, collect, receive, produce, and distribute child pornography as discussed in paragraphs 6 and 7 above.

45.     Based on my training, knowledge and experience, individuals who have a sexual interest in children and who produce, distribute, receive and possess child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment.  These collections are often maintained for many years – even decades.  These individuals go to great lengths to conceal and protect their collection from discovery, theft, and damage.  Individuals who collect child pornography prefer not to be without their child pornography for any prolonged time period and therefore they tend to keep their collection where they can easily access it such as in their residence, vehicles and place of employment, as well as on their person.  Individuals who collect child pornography also tend to keep their collection on multiple devices, many of which are portable such as a smartphone, laptop computer, and external storage devices, such as flash drives, external hard drives, and other storage media.  In my investigative experience, as well as the documented experience of other investigators, these

devices are often kept in the individuals' homes, vehicles, place of employment and on their person.

## **CONCLUSION**

46.     Based on the foregoing information, I have probable cause to believe that contraband, evidence, fruits, and instrumentalities of the TARGET OFFENSES as set forth herein and in Attachments B-1 through B-5 are currently contained in the TARGET ACCOUNTS, more fully described in Attachments A-1 through A-5.  I therefore respectfully request that search warrants be issued authorizing the search of the TAGET ACCOUNTS described in Attachments A-1 though A-5 for the items described in Attachments B-1 through B-5 and authorizing the seizure and examination of any such items found therein.  Additionally I request that the search of related to these warrants occur anytime day or night owing to the fact that the warrants relate to online accounts only.

_____
Special Agent Susan Ambridge Paris
Federal Bureau of Investigation


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and Fed. R. Crim. P. 41(d)(3) this _10th_ day of May, 2023.

_____
HONORABLE A. DAVID COPPERTHITE
UNITED STATES MAGISTRATE JUDGE


Type text here